**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| United States of America, | No.  CR-23-00125-TUC-SHR (EJM) |
|---|---|
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Jaymes Havier, | |
| Defendant. | |

The issue before the Court is whether the defendant has been restored to competency to stand trial.  Based on a competency evaluation conducted by Dr. Barry Morenz, the parties stipulated that the defendant was not competent.  The defendant was ordered to participate in an in-patient competency restoration program in a Bureau of Prisons ("BOP") medical facility.  After completing that program, Dr. Nicole Osborn opined that the defendant had been restored to competency.   Dr. Morenz conducted another evaluation of the defendant and opined that he is still not competent to stand trial.  At the request of defense counsel, the Court conducted a competency hearing.

For the reasons discussed below, the Court concludes that the defendant is still not competent to stand trial.  First, the defendant has cognitive deficits that affect his ability to retain information about legal concepts, the court process, and the key players in that process.  The defendant's inability to retain this information arose during each of his many meetings with Dr. Osborn, Dr. Morenz, and defense counsel.  Second, Dr. Osborn did not adequately explain the basis for her opinions that the defendant has a rational understanding

of the proceedings against him and the ability to assist counsel in his defense.  By contrast, Dr. Morenz provided a thorough explanation for his contrary opinions.  Finally, the Court affords great weight to defense counsel's opinion that the defendant's memory problems significantly impact his understanding of the proceedings and his ability to assist counsel. As a result, the Court recommends that the District Court find that the defendant has not been restored to competency.

## I.    FACTUAL BACKGROUND

On February 2, 2023, a federal grand jury sitting in Tucson, Arizona, returned an Indictment against the defendant charging him with Second Degree Murder, in violation of 18 U.S.C §§1111 and 1153. (Doc. 10.)   On August 10, 2023, defense counsel filed an *Ex Parte* Motion to Transport Defendant for Psychological Evaluation. (Doc. 24.) Specifically, counsel requested that Dr. Barry Morenz conduct a competency evaluation of the defendant.  (*Id*.)  Dr. Morenz conducted his evaluation on October 3, 2023, and issued a report dated December 8, 2023, in which he opined that the defendant is not competent to stand trial.  (Def. Ex. 52.)   The Court turns to a discussion of that report.

### A.    Dr. Morenz's report dated December 8, 2023

Dr. Morenz first noted that the defendant did not initially understand the purpose of the evaluation; however, after explanation "he understood that the evaluation was not for treatment and was to determine if he was emotionally able to go through court." (Def. Ex. 52 at 1.) The defendant denied being depressed, suicidal, or hopeless; he described his mood as good.  (*Id*. at 2.)

The defendant could identify the victim of the charged offense.  (*Id*. at 2.) He said that he was charged with second degree murder and could face up to five years in prison. (*Id*.)   He is not worried about the pending charge.  (*Id*.)   He identified his attorney as "Jordan," and said that he has met with him on a couple occasions.  (*Id*.)  The defendant said that his attorney's role is to "find evidence," "help you," and "see if I tell the truth." (*Id*.)  He said that the prosecutor would "get whatever is left out of me." (*Id*.)  He also said the prosecutor will try to help him.  (*Id*.)  The jury decides whether he is guilty or not, but

he did not know where jurors came from or how many people sit on a jury. (*Id.*) He initially said that he did not know the role of the judge; he then said "[g]ive me more time in jail." (*Id.*) He said they have been "switching judges" recently. (*Id.*) The defendant did not know his legal rights. (*Id.*) When asked what type of defense he would use, he said: "Not say anything." (*Id.*) He was afraid he would get more time if he talked. (*Id.*) He also said that "[t]hey already said I was guilty." (*Id.*) However, he then said the prosecutor said he was "not guilty" and gave a paper to the judge. (*Id.*) He said that when officers came to get him this morning, he thought he was going to be released. (*Id.*) When asked if he thought the proceedings against him were confusing, he said: "Not really." (*Id.*) He said it is "kind of a deal, a handshake." (*Id.*) He did not know what a plea agreement was or how the charges would be resolved, but he thinks the proceedings against him will be fair. (*Id.*)

The defendant has never had any psychiatric treatment or taken any medications for a mental health condition. (*Id.* at 3.) He denied having hallucinations or believing that people were conspiring against him. (*Id.*) He does not believe he has special or unusual powers. (*Id.*) He sometimes becomes depressed for a month but denied having problems with anxiety. (*Id.*)

The defendant was raised in a village on the Tohono O'odham Reservation. (*Id.* at 2.) He was with his parents for about a year, then his aunt, and then his grandmother. He denied being abused or mistreated. (*Id.*) He liked school but never graduated high school. (*Id.* at 3.) He said he was "naughty" in high school. (*Id.*) According to school records, he was suspended several times for having alcohol and drugs and fighting. (*Id.*) He worked for a construction company for eight years. (*Id.*) The defendant began using marijuana when he was eight years old and has also used methamphetamines and alcohol. (*Id.*)

The defendant was cooperative and remained alert throughout the examination. (*Id.* at 3.) His mood was euthymic and his affect showed limited range. (*Id.*) He was soft-spoken and his speech was sometimes garbled, making him difficult to understand even with repetition. (*Id.* at 3-4.) His responses tended to be brief. (*Id.* at 4.) He was not

tangential or circumstantial and there was no loosening of associations noted. (*Id*. at 4.) There also was no evidence of delusions, hallucinations, or suicidal or homicidal tendencies. (*Id*.) The defendant's score on a cognitive test was 16 out of 30, which was a surprisingly low score that indicated probable cognitive deficits assuming he was putting forth full effort. (*Id*.)

Dr. Morenz diagnosed the defendant with a mild neurocognitive disorder (provisional). (*Id*.) Dr. Morenz believes that the defendant probably has some significant cognitive deficits; but is not clear if they were present from birth, whether his mother had a problem pregnancy, or whether they were acquired from head injuries and/or substance abuse. (*Id*.) He may also have learning disabilities, but full neuropsychological testing would be needed to determine the extent, nature, and severity of his cognitive deficits. (*Id*.)

Dr. Morenz concluded that the defendant is not competent to stand trial. (*Id*.) His understanding of basic courtroom proceedings is limited and at times inaccurate, which will seriously compromise his ability to assist counsel and make informed legal choices. (*Id*.) In attempting to restore the defendant to competency, Dr. Morenz recommended that full neuropsychological testing be done to determine the extent of the defendant's cognitive deficits. (*Id*.) If his cognitive deficits are not too severe and he is capable of learning, an educational program to provide instruction about basic courtroom proceedings would be needed. (*Id*.)

## B. The Court finds that the defendant is incompetent and orders in-patient restoration.

On July 24, 2024, defense counsel filed a Motion for Court Finding of Incompetency Pursuant to 18 U.S.C. §4241. (Doc. 40.) Counsel requested that this Court enter an order finding the defendant incompetent to stand trial based on Dr. Morenz's report. (*Id*.) Defense counsel noted that the government agreed that the defendant is not competent. (*Id*.) The Court granted defense counsel's motion. The government moved for the defendant to participate in a BOP in-patient competency restoration program.

On July 29, 2024, the Court entered an Order of Commitment directing that the

defendant be committed to the custody of the Attorney General to be hospitalized in a suitable facility for a reasonable period of time, not to exceed four months, to determine whether there is a substantial probability that in the foreseeable future the defendant will attain capacity to permit the proceedings go forward. (Doc. 41.)  On September 19, 2024, the Court entered an Order of Continued Commitment extending the defendant's commitment period for forty-five days. (Doc. 42.)

### C.    Dr. Osborn's report dated February 12, 2025

On February 13, 2025, the Court was provided with a report from Dr. Nicole Osborn, a psychologist at the BOP Metropolitan Correctional Center in Chicago, Illinois ("MCC Chicago"). (Def. Ex. 51.)  Dr. Osborn concluded that the defendant has been restored to competency.  Dr. Osborn's evaluation and findings detailed in her report are set forth below.

Dr. Osborn and other mental health professionals at MCC Chicago conducted an evaluation of the defendant from August 28, 2024 to December 26, 2024. (*Id.* at 1.)  The defendant was first seen by Health Services staff on August 29, 2024. (*Id.* at 10.)  He presented as "alert and oriented" and was cooperative. (*Id.*)  He reported no history of health conditions or a history of taking psychotropic medications. (*Id.*)

On August 30, 2024, the defendant was seen by another psychologist for an intake screening and introduction to the restoration program. (*Id.* at 12.)  The defendant was alert and oriented to date and time but was unsure why he was sent to MCC Chicago. (*Id.*)  He said that he was charged with second degree murder.  His thought processes were concrete and he often responded to questions with a single word or short phrase. (*Id.*)

On September 6, 2024, the defendant was seen by a contract psychiatrist to evaluate the need for psychiatric medication. (*Id.* at 10.)  The defendant said his mood was "okay." (*Id.*)  He presented as oriented and with "linear" and "goal directed thought processes." (*Id.*)  The defendant reported no history of psychiatric diagnoses or treatment. (*Id.*)  He denied having problems with his mood, depression, or self-harming behavior. (*Id.*)  He also "denied that he has experienced symptoms of auditory hallucinations or delusions in

the past." (*Id.*)  The defendant was not interested in taking psychotropic medications.  (*Id.*)

On September 9, 2024, Dr. Osborn conducted a forensic intake with the defendant.  (*Id.* at 12.)  He was alert and partially oriented; he knew his name, age, and the year, but could not recall the month, day, or the reason he was at MCC Chicago.  He had a neutral mood and a flat affect.  (*Id.*)  His speech was clear but his thought processes were disorganized and tangential – *e.g.*, digressing to irrelevant topics and never returning to the main topic of conversation — which made it hard to follow his train of thought.  (*Id.*)  He initially denied auditory hallucinations but later said that he heard a voice.  (*Id.*)  He said his attorney's name is Jordan.  (*Id.* at 13.)  When asked to describe the role of the judge, he said: "To see if I'm telling a lie and just to work with me."  (*Id.*)  He said his defense attorney's role is to "be on my side."  (*Id.*)  He said the prosecutor's role in court is to "keep their secret," but he could not elaborate on what he meant.  (*Id.*)  Witnesses are "on hand" and "watch and observe."  (*Id.*)  When asked what witnesses are tasked with deciding, he said: "If it was a good fight."  (*Id.*)

On September 12, 2024, Dr. Osborn met with the defendant to assess his mental status and obtain additional psychosocial information.  (*Id.*)  He denied any current auditory hallucinations.  (*Id.*)  His speech remained somewhat disorganized and difficult to follow at times.  (*Id.*)  He said he was willing to meet with a psychiatrist and take any recommended medication.  (*Id.*)

At Dr. Osborn's request, the defendant was seen by a contract psychiatrist on September 13, 2024.  (*Id.* at 11.)  The defendant admitted that he does experience auditory hallucinations.  (*Id.*)  They started when he was around 18 years old when he was doing a lot of drugs.  (*Id.*)  The hallucinations have been "on and off" since then.  (*Id.*)  He said that "[w]hen I try to bother with them, they get worse."  (*Id.*)  Because the defendant said he was willing to take medication, he was prescribed an antipsychotic medication.  (*Id.*)

On September 20, 2024, the defendant's treatment progress was discussed at a multidisciplinary team meeting.  (*Id.* at 13.)  The defendant was consistently attending treatment groups and had "good" participation.  (*Id.*)  He was also compliant in taking his

medication.  (*Id.*)

On October 1, 2024, the defendant was seen by Health Services staff for a routine follow-up appointment.  (*Id.* at 11.)   The defendant was alert, oriented, calm, and cooperative.  (*Id.*)  He said that he was "feeling better" and denied experiencing auditory hallucinations.  (*Id.*)  No changes were made to his medication.  (*Id.*)

On October 11, 2024, the defendant's progress was again discussed at a multidisciplinary team meeting.  (*Id.* at 14.)  The defendant consistently attended treatment groups and appeared to be understanding and retaining material.  (*Id.*)   He asked appropriate questions in group and would help his peers answer questions posed by treatment staff if they were having difficulty.  (*Id.*)  The defendant continued to take his medication and reported that he was feeling better and was not experiencing auditory hallucinations.  (*Id.*)  He had not requested any unmonitored phone calls with his attorney. (*Id.*)

At another multidisciplinary team meeting on November 8, 2024, it was reported that the defendant had good attendance and participation in group meetings.  (*Id.*)   He answered questions posed in group correctly and told staff that he reads materials outside of group meetings.  (*Id.*)  The defendant's speech remained a little "disjointed" at times. (*Id.*)  However, he appeared to have intact memory as he recalled a conversation that he had with the psychiatrist a month before.  (*Id.*)  He continued to take his medication and had not requested phone calls with his attorney. (*Id.*)

On November 27, 2024, Dr. Osborn met with the defendant to assess his mental status and screen his progress with competency restoration.  (*Id.*)  The defendant reported that he felt that he was able to understand and remember material presented in group meetings.  (*Id.*)  He said that the judge is in charge of the court and the judge's role is "to find you guilty or not."  (*Id.*)  He said that a lawyer stands up for the defendant in court and a defense attorney is "there to help you out."  (*Id.*)  When asked how a defense attorney does that, he said: "they just say I didn't do it and try to tell my side of the story in his own words."  (*Id.*)  He said the prosecutor's role is to "find stuff . . . evidence to see if you are

lying or not." (*Id.*)  He also said the prosecutor wants a defendant to be found guilty.  (*Id.*)  He said he should not talk to the prosecutor without his lawyer present because "my lawyer wouldn't help me out."  (*Id.*)  He said his charge was second degree murder and he was able to appropriately describe the allegations against him.  (*Id.*)  He believed that he could be imprisoned for 25 years to life if found guilty.  (*Id.*)  He was able to recall when and where he was arrested.  (*Id.* at 15.)  He described the best and worst outcomes of his case.  (*Id.*)  "However, his perception about how his case is likely to be resolved appeared to suggest poor rational understanding." (*Id.*)

On November 29, 2024, the defendant was again seen by a contract psychiatrist at Dr. Osborn's request.  (*Id.* at 11.)  The defendant said he has gotten better since taking medication and has not had auditory hallucinations.  (*Id.*)  However, he said he has difficulty putting his thoughts together when he is talking for longer periods of time.  (*Id.*)  The defendant's medication dosage was increased.  (*Id.*)

On December 4, 2024, the defendant was administered the Personality Assessment Inventory.  (*Id.* at 15.)  The defendant was able to complete the test and decode and comprehend the items adequately.  (*Id.*)  However, he asked for the definition of the following words: occupation, jittery, exaggerated, financial stress, seldom, impulse, diarrhea, and stability.  (*Id.*)  He also asked how to pronounce the word "affectionate" and its definition.  (*Id.*)

The defendant's treatment progress was discussed in a multidisciplinary team meeting on December 6, 2024.  (*Id.*)  The defendant was consistently attending group meetings and was doing "fairly well" with regard to his understanding of the material.  (*Id.*)  He answered questions correctly and reported reviewing group materials outside of group meetings.  (*Id.*)

On December 10, 2024, Dr. Osborn met with the defendant to obtain additional psychosocial information.  (*Id.* at 16.)  The defendant was oriented to place, time, and situation.  (*Id.*)  He was engaged and cooperative.  (*Id.*)  His responses to questions were at "a somewhat delayed pace," but his speech was logical and goal-oriented.  (*Id.*)  He did

not appear to be experiencing auditory hallucinations or delusional beliefs.  (*Id.*)  "Overall, he did not appear present with active symptoms of major mental illness."  (*Id.*)

On December 12, 2024, the defendant was administered the Wechsler Abbreviated Scale of Intelligence.  (*Id.* at 15.)  The defendant seemed to concentrate, did not appear distracted, and did not require repetition of the instructions.  (*Id.* at 15-16.)  With respect to his effort, "towards the end of the Matrix Reasoning subtest, he was unmotivated and simply selected answers without giving much thought to it.  Overall, mental status was within normal limits."  (*Id.* at 16.)  The defendant's "overall Full-Scale IQ score was 63, which falls into the Extremely Low range as compared to adults his age."  (*Id.* at 18.)  If the defendant "approached the assessment with motivated effort, there is a 95% change that his true score falls within the range of 58-72."  (*Id.*)  "[B]ehavioral observations of [the defendant's] functioning while at MCC Chicago suggest that his functioning is higher than is reflected in his overall IQ score." (*Id.*)

On December 23, 2024, Dr. Osborn interviewed the defendant regarding his competency-related abilities.  (*Id.* at 16.)  His speech was logical and goal oriented, and he was oriented as to time, person, and place.  (*Id.*)  He was able to sustain attention throughout the interview and appropriately respond to questions.  (*Id.*)  "He took time to think about his answers and provided responses at a pace that is slightly slower than is typical.  He often asked for questions to be repeated and was able to appropriately respond to questions with repetition."  (*Id.*)

Dr. Osborn and the defendant first discussed his understanding of the court proceedings.  When asked the purpose of going to trial, the defendant said:  "To decide whether you are guilty or not guilty . . . of the case they put you on."  (*Id.* at 19.)  He said that the person charged with a crime is the defendant and the judge is in charge of the court and is neutral.  (*Id.*)  The judge's role is to "hear out your story and what others think about me."  (*Id.*)  He knows that juries are comprised of 12 members, the members are randomly selected from the public, and the members cannot have a felony conviction or know the defendant.  (*Id.*)  The members of the jury are supposed to be neutral; their role is to "listen

to both sides and see if you are guilty." (*Id.*)  The defendant was initially unable to describe the difference between a bench trial and a jury trial.  (*Id.*)  After education, he said: "A bench trial is when the judge decides if you are guilty or not guilty.  A jury decides if you are guilty or not guilty in a jury trial." (*Id.*)

The defendant initially said that the prosecutor determines the sentence if a defendant is found guilty.  (*Id.* at 20.)  After education, he said the judge was responsible for sentencing.  (*Id.*)  With respect to the kind of sentences that can be imposed, he said "to serve time, pay a fine, be put on probation."  (*Id.*)  He said that people on probation or parole could be placed on house arrest and they must "behave, stop smoking and drinking," and "keep checking in with . . . like a police officer;" he later clarified that he was referring to a probation officer.  (*Id.*)  He said that if a person violates probation they can "get thrown in jail."  (*Id.*)

When asked who stands up for you in court, he said: "Your lawyer."  (*Id.*)  He said a defense attorney's job is to "be on your side" and "remind you of what is going on, help you to be found not guilty, to be there for [you]."  (*Id.*)  However, he acknowledged that a defense attorney cannot always prove a defendant's innocence.  (*Id.*)  He said that a prosecutor's job is to "find evidence against you" and "wants you to be found guilty."  (*Id.*)  The role of a witness is "[t]o give and tell their side of the story."  (*Id.*)  He acknowledged that witnesses are supposed to tell the truth.  (*Id.*)

The defendant said that guilty or not guilty are the options of pleas that can be used in court.  (*Id.*)  When asked to discuss the meaning of the pleas, he said that guilty means "[t]hat they are the one that committed the crime" and not guilty means "[t]hat you are innocent."  (*Id.*)  A person found guilty will have "to do prison time" and a person found not guilty will be released.  (*Id.*)  Education was provided about a plea of not guilty but insane (NGRI) and an Alford/no contest plea.  (*Id.*)  He said that NGRI means "that the person was mentally ill" and that individuals found NGRI "go to a hospital."  (*Id.*)  He said an Alford plea allows the  defendant to "put on a bench trial or jury trial."  After education, he said that an Alford plea means "that you were there at the time."  (*Id.*)

- 10 -

The defendant initially said that he was unable to identify the courtroom participants who are involved in the plea-bargaining process; he was also unsure whether a defendant is required to accept a plea bargain. (*Id.* at 21.) After education, he said that "your lawyer, the prosecutor, and [the defendant]" are involved in the plea bargain process. (*Id.*) He also said that a defendant is not required to accept a plea bargain and must say "that you did it" to accept one. (*Id.*)

The defendant replied "no" when asked if he should talk to the prosecutor without his lawyer present. (*Id.*) He said it would not be a good choice because "[h]e can use anything against you." (*Id.*) Dr. Osborn believes that the defendant is able to understand the prosecutor's role and the adversarial nature of the court proceedings. (*Id.*)

The defendant said that he is not required to testify because "[y]ou could give yourself away. You could slip and say something that wouldn't help." (*Id.*) If his attorney suggested that he testify he would "go along with it" because his attorney "talks everything out" with him. (*Id.*) He said he would want to prepare for his testimony with his attorney. (*Id.*) Dr. Osborn believes that the defendant is aware of the drawbacks of testifying and is able to rationally appraise whether his testimony could be beneficial or harmful to his case. (*Id.*)

Dr. Osborn's report notes that the defendant was provided with a hypothetical case scenario to assess his competency-related abilities. (*Id.*) She notes that the defendant had a good understanding of the plea bargain process and was able to identify evidence that could be presented. (*Id.*) He was also asked to rationally appraise whether the plea bargain was in the defendant's best interest. (*Id.*) However, Dr. Osborn did not detail the hypothetical discussed or the defendant's statements. (Id.) Dr. Osborn also notes that the defendant was able to rationally explain the best, worst, and likely outcomes in his case; but she does not detail that discussion. (*Id.*)

Dr. Osborn believes that the following facts show that the defendant is able to assist his attorney in his defense. The defendant identified his attorney as "Jordan Malka," and said that he has spoken with him about eight times. (*Id.* at 22.) He has a positive

relationship with his attorney.  (*Id.*)  He acknowledged that he would speak with his attorney if he disagrees with him.  (*Id.*)  If he disagrees with something said in court or does not understand something said in court, he would tell his attorney.  (*Id.*)  If offered a plea bargain, he would discuss it with his attorney.  (*Id.*)  He expects his attorney "[t]o help me and stand up for me."  He could best help his attorney by "telling him the truth[.]"  (*Id.*)

The defendant identified the pending charge as Second Degree Murder and he was able to describe the allegations related to the charge in a rational manner.  (*Id.*)  He said that if found guilty he could receive a long prison sentence.  (*Id.*)  Dr. Osborn notes that the defendant was able to identify evidence that might be presented in his case and the witnesses that might testify.  (*Id.*)  However, once again, Dr. Osborn does not set forth that discussion.

### D.    Dr. Morenz's second competency evaluation

On June 9, 2025, defense counsel filed an *Ex Parte* Motion to Transport Defendant for Psychological Evaluation.  (Doc. 55.)  Counsel requested that Dr. Morenz conduct another competency evaluation because defense counsel still believed that the defendant is not competent.  The Court granted the defense motion.  (Doc. 56.)

On June 25, 2025, Dr. Morenz conducted another competency evaluation of the defendant.  Dr. Morenz authored a report dated July 7, 2025, in which he opined that the defendant is still not competent to stand trial.  (Def. Ex. 53.)  A discussion of Dr. Morenz's report follows.

The defendant said he can be angry, sad or happy during the day.  (*Id.* at 2.)  "He said it is hard for him to know how he will be feeling.  Overall, he said he is okay, and he is not suicidal."  (*Id.*)  With respect to references in Dr. Osborn's report that he believed "rattlesnakes were changing their form or people were changing their form or sex," the defendant said that "he does not experience any of that now.  He is also not experiencing any auditory hallucinations."  (*Id.* at 2)

The defendant went to classes at MCC Chicago to learn about court.  (*Id.*)  "He said he did learn about court, but it is easy for him to forget."  (*Id.*)  He learned where everyone

sits in court – the jury sits to the side, the judge sits in front of everyone, and the prosecutor sits at a table away from the defense attorney.  (*Id.*)  He did not know about the court reporter, but knows that the bailiff "keep[s] track of what was going on in court."  (*Id.*)  He was able to describe the time of the alleged offense and that he was charged with second degree murder and could face a sentence of "25 to life," which would be his "whole life[.]"  (*Id.*)  He is not sure if he will ever be free again.  (*Id.*)  His attorney wants to argue that he is "mentally not all there," but he is not sure how that would help him.  (*Id.*)  He said the prosecutor believes that he "is capable of doing it" and should go to prison.  (*Id.*)  He is not sure of what would happen with a trial and with a jury.  (*Id.*)  He said that he could tell his "side of the story to the jury and the jury decides what they think about it."  (*Id.*)  He knows there are 12 jurors, but he does not know where they come from.  (*Id.*)  He said the jury decides if he is guilty or not and that guilt means "that you are caught."  (*Id.*)  When asked what would happen if two or three jurors think he is not guilty, he said they would "go with the one that has more."  (*Id.*)  He said the "judge mainly decides guilt but if there's a jury, it's the [jury's] job."  (*Id.*)  The judge is in charge of the courtroom and makes sure everyone does their job.  (*Id.*)  He could not describe what would guide the judge in resolving disputes.  (*Id.*)  He is also unsure how the judge would determine his sentence.  (*Id.*)

The defendant could not enumerate his legal rights.  (*Id.*)  When asked if he had a right to remain silent, a right to an attorney, and the right to a trial, he said he did in response to each question.  (*Id.*)  When asked to describe a plea agreement, he said: "Instead of going with the big stuff, go with a second plan that they are sure we could come to an agreement on."  (*Id.*)  He said he has been offered a plea of 12 to 15 years with 5 years probation.  (*Id.*)  He would have to admit to second degree murder if he accepts the plea agreement.  (*Id.*)  When asked what he would lose if he accepted the plea agreement, he said: "Losing the truth of what happened."  (*Id.*)  The defendant first said that he had pled guilty, but then changed it to not guilty; he has not been sentenced yet.  (*Id.*)  The defendant thinks that the proceedings against him would be fair.  (*Id.*)  He knows that he must dress appropriately

for court and behave with respect. (*Id.* at 2-3.)

Dr. Morenz still believes that the defendant is not competent to stand trial. (*Id.* at 3.) Dr. Morenz concluded that "[w]hile he has an improved understanding of basic courtroom procedures, his understanding is incomplete and sometimes inaccurate to the extent that it would compromise his ability to rationally assist his attorney in his own defense." (*Id.*) Because of the defendant's low intelligence, he "looks to others to assist him with decisions, a common attribute among those with cognitive impairment." (*Id.*) As a result, it would be difficult for the defendant "to make autonomous independent decisions about how to proceed in court. He will have a strong tendency to just do whatever he perceives his attorney wants him to do." (*Id.* at 3.)

## II.    THE COMPETENCY HEARING

On July 14, 2025, the Court held a status conference regarding the Dr. Morenz's opinon that the defendant was still not competent. (Doc. 58.) At the request of defense counsel, the Court set a competency hearing for September 17, 2025. (*Id.*) Two witnesses testified at that hearing: Dr. Osborn and Dr. Morenz. Their testimony is set forth below.

### A.  Dr. Nicole Osborn

#### 1.   Direct Examination

Dr. Osborn obtained a Bachelor of Science in Psychology in 2009 from Southern Illinois University. (9/17/25 Tr. at 11.) She obtained a Masters of Art in clinical psychology in 2013 from the Forest Institute of Professional Psychology. (*Id.*) She obtained her Doctorate in 2017 from Wright Institute in Berkely, California. (*Id.* at 10.) She did her postdoctoral residency at West Central Georgia Regional Hospital where she conducted forensic examinations, including competency and criminal responsibility evaluations. (*Id.*) She became licensed in Georgia in 2019 and in Illinois in 2025. (*Id.*) She first worked at the BOP Federal Correctional Complex in Terre Haute, Indiana, where she primarily did treatment. (*Id.*) She has been working at the BOP Metropolitan Correctional Center in Chicago, Illinois for the past three years. (*Id.* at 9.) Dr. Osborn has done "[p]robably close to 50" competency evaluations during her time at West Central

Georgia Regional Hospital and MCC Chicago. (*Id*. at 11.)

The defendant was at MCC Chicago from August 2024 to December 26, 2024. (*Id*. at 12.) The defendant was cooperative during his time there. (*Id*. at 24.) He was "first seen by health services staff for an intake screening on August 29, 2024[.]" (*Id*. at 13.) Dr. Osborn conducted the defendant's forensic intake on September 9, 2024. (*Id*.) During that meeting, the defendant provided some basic background information. (*Id*.) However, he could not recall the month, day, or the reason he was at MCC Chicago. (*Id*.) He also became disorganized and tangential. (*Id*.) Dr. Osborn had "concerns about potential symptoms of psychosis" so she asked a psychiatrist to meet with the defendant. (*Id.* at 14.) During that meeting, the defendant described experiencing auditory hallucinations. (*Id*.)

The defendant was initially unwilling to take antipsychotic medication; however, he agreed to do so about a month later. (*Id*. at 14-15.) The defendant had a good response to the medication. (*Id*. at 16.) He was more organized, he was less distracted, he was able to follow conversations and respond appropriately, and "[h]e was no longer observed to experience auditory hallucinations." (*Id*.) Additionally, "[h]is speech was more articulate and logical," and was at a normal rate and volume. (*Id*. at 24.)

The defendant participated in competency restoration classes at MCC Chicago. (*Id*. at 17.) Those classes are held weekly in a group format. (*Id*. at 17-18.) The competency restoration group is comprised of 12 formal group sessions. (*Id*.) The defendant attended 28 of 29 sessions while at MCC Chicago. (*Id*. at 18.) The defendant was an active participant in the classes. (*Id*. at 19.)

Dr. Osborn is "satisfied with the defendant's knowledge of the court process[.]" (*Id*.) He was able to describe the time of the alleged offense; he understood that the charge was second degree murder; he was aware that the maximum sentence is life in prison; "he seemed to understand . . . what his attorney could argue on his behalf;" he seemed to understand the role of the prosecutor and the judge; he was aware that the process is adversarial; and he understood that the role of the jury is to "see the evidence and come up with a verdict[.]" (*Id*. at 19-20.) After being provided with some education, he was able

to understand the difference between a jury trial and a bench trial.  (*Id*. at 20-21.)  He was also aware that he should "dress well and present [himself] well because a jury is going to be looking at [him.]"  (*Id*. at 24.)

With respect to his constitutional rights, the defendant understood the right to remain silent and the right to have an attorney.   (*Id*. at 22-23.)  He "seemed to understand the difference between going to trial and the consequences of going to trial" versus "taking a plea agreement[.]"  (*Id*. at 23.)

Dr. Osborn diagnosed the defendant with an "other specified personality disorder" and a substance abuse disorder.  (*Id*. at 26.)  Dr. Osborn was considering diagnoses of schizophrenia and substance abuse psychotic disorder, but she needed more information to diagnose either condition.  (*Id.* at 27.)   However, even if those diagnoses are warranted, she believes that the defendant can manage those conditions by refraining from illicit substances and taking antipsychotic medication.  (*Id*. at 27-28.)

The defendant has some intellectual disabilities.  (*Id*. at 26.)   His IQ score of 63 falls "into the borderline range of functioning."  (*Id*.)   As a result, Dr. Osborn believes that the defendant "would benefit from repetition, rephrasing, and the use of clear and concise language."  (*Id.* at 28.)   Additionally, he would benefit from reviewing relevant legal materials, such as discovery, with counsel.  (*Id*.)

### 2.   Cross-Examination

Dr. Osborn has testified in court about the results of her competency examinations approximately ten times.   (*Id*. at 30-31.)

Dr. Osborn diagnosed the defendant with "other specified personality disorder" because "there was insufficient evidence of his past" to make the formal diagnosis of antisocial personality disorder.  (*Id*. at 31.). Although Dr. Osborn did not diagnose the defendant with an antisocial personality disorder, he "presents with features of antisocial personality characteristics."  (*Id*.)   These features include: failing to conform to social norms, impulsive behavior, unlawful behavior, irresponsibility, and physical altercations. (*Id*. at 32.)  The definition of an antisocial personality disorder is "an enduring pattern of

disregarding others and violating the rights of others[.]" (*Id.*)

The defendant's long-term alcohol and drug use, which began when he was around eight years old, could have impacted his brain development. (*Id.* at 37.) Specifically, long-term substance use can cause memory, learning, and attention deficits, impair impulse control and problem solving skills, cause emotional regulation problems, and impact cognitive processing. (*Id.*) The removal of drugs and alcohol from the defendant's life while at MCC Chicago alleviated any issues with impulse control. (*Id.* at 38.)

During the PAI test, the defendant "asked for basic definitions for words like impulse, diarrhea, stability, jittery, exaggerated, financial stress, [and] seldom." (*Id.* at 40.) Dr. Osborn concluded that the defendant has a full scale IQ of 63 "with a 95 percent confidence interval ranging from 58 to 72." (*Id.* at 44.) Dr. Osborn thinks that the defendant's "full scale IQ of 63" could be "slightly higher" because he put forth "low effort toward the end of the test[.]". (*Id.* at 42.) The defendant became "kind of disengaged a little bit and had less motivation" on the Wechsler test, likely because it is a long test and he was tired. (*Id.* at 42-43.) With respect to the Validity Indicator Profile test, at times the defendant put forth "very good effort," and at times his effort was "a little bit depleted." (*Id.* at 46.)

There are between eight and ten people in the group restoration classes at MCC Chicago. (*Id.* at 47.) The instructors are a psychologist and a specialist who has a master's degree in psychology. (*Id.*) The defendant would have been required to speak in front of others and answer questions. (*Id.*) The restoration program consists of twelve sessions; the defendant attended twenty-eight sessions. (*Id.* at 48.) It is common for patients to attend more than one session on the same subject matter. (*Id.* at 48-49.)

On September 9, 2024, Dr. Osborn conducted a forensic intake with the defendant. (*Id.* at 49.) At that point, he "probably didn't have many" restoration classes. (*Id.*) The defendant told Dr. Osborn that "the judge's role is to see if I'm telling a lie and just to work with me." (*Id.*) "He said the prosecutor's role was to keep their secret." (*Id.* at 50.) He said the role of witnesses "was to be hands on and watch and observe and to determine if

it was a good fight." (*Id*.)

On November 27, 2024, Dr. Osborn again met with the defendant. (*Id*. at 50.) At this point, he had been taking antipsychotic medication and attended many restoration classes. (*Id*.) The defendant "said that he could be in prison . . . for this offense for 25 years to life." He also said that "he should not speak with a prosecutor without his attorney because 'my lawyer wouldn't help me out.'" (*Id*. at 51.) Dr. Osborn noted in her report that the defendant's "perceptions about how his case is likely to . . . be resolved appear to suggest poor rational understanding." (*Id*. at 51-52.) Stated another way, the defendant's "beliefs about the case outcome wasn't grounded in reason or logic or reality[.]" (*Id*. at 52.)

Dr. Osborn met with the defendant less than a month later on December 23, 2024, and administered the formal competency test. (*Id*. at 52.) Dr. Osborn's opinion is that within a month, the defendant "developed rationalization skills and was able to understand the possible outcomes of his case[.]". (*Id*.)

While at MCC Chicago, the defendant "made no phone calls to either of his attorneys" or his family. (*Id*. at 53.) He was offered his attorney's contact information but did not want it. (*Id*.) There is no information in the records that reflect that the defendant expressed concern about his case or a desire to get back to Arizona. (*Id*. at 53-54.)

### 3.  The Court's Examination

The defendant was "able to get through all of the subject areas" covered in the restoration classes. (*Id*. at 54.) There is "no passing or failing[.]" Whether someone is competent is determined at the end of the evaluation. (*Id*.) The treatment staff determined that the defendant was doing well and did not need individual meetings; in fact, he "was helping some of his peers with the information and was reviewing it outside of group as well." (*Id*. at 55.) The facts of a defendant's case are not discussed during the group classes. "Anything specific to [a defendant's] case would have been discussed" in Dr. Osborn's meetings. (*Id*. at 56.) When a defendant struggles with a certain concept, Dr. Osborn provides education and then goes back to the concept to see if the defendant retained the

information.  (*Id.* at 57.)

Dr. Osborn had about five or six formal interviews with the defendant.  (*Id*. at 55.) She also had informal "observations of everyone doing their daily things when they're not kind of expecting that [she is] paying attention."  (*Id*.)  There are also weekly staff meetings where updates on patients are provided.  (*Id.*)

Dr. Osborn relies on the following facts to determine if a defendant can assist counsel: whether they know their attorney's name; if they have an opinion about their attorney; and if they are willing to work with their attorney or "if they have complete disagreement with working with them."  (*Id*. at 58.)  If a defendant disagrees with their attorney, Dr. Osborn asks how they would resolve that issue.  (*Id*.)  Her hope is that a defendant would want to talk to the attorney and not "immediately try to fire the person or haul off and hit them or something."  (*Id*.)  The defendant was able to "appropriately answers those questions."  (*Id*.)

Additionally, "he knew what the charge was.  He was able to describe the allegation . . . in a logical manner.  He was able to identify that if he was found guilty, he would very likely go to prison."  (*Id*.)  "[H]e's aware of what a plea deal is."  (*Id.* at 60.)  He was able to recall when he was arrested on the charge.  (*Id.* at 58.)  "He was able to identify evidence that may be presented and a witness that might testify."  (*Id*.)

The defendant also understands proper courtroom behavior.  (*Id.*)  For example, he knew that you cannot "speak at any time" or interrupt.  (*Id.*)  "If something's said that he disagreed with" he could "let his attorney[s] know in an appropriate way" and they would be the ones who would address that.  (*Id.* at 58-59.)

With respect to strategic decisions that attorneys have to make with client input, Dr. Osborn presented the defendant with a hypothetical case scenario.  (*Id.* at 60.)  The defendant "was able to identify evidence that could be presented in that person's case [and] witnesses that could be a part of the case."  (*Id.*)  "[H]e was able to appropriately decipher what would be an objectively good [plea] deal or an obviously bad deal from an objective opinion."  (*Id.*)

1

2        **B.    Dr. Barry Morenz**

3            1. Direct Examination

4        Dr. Morenz is a psychiatrist and physician licensed to practice medicine in Arizona.

5    (*Id*. at 63.)  He graduated from Indiana University Medical School in 1978.  (*Id*.)  He did

6    his internship and three years of residency at the University of Arizona Department of

7    Psychiatry.  (*Id*.)  In 1982, he "went to work at Kino, now Banner South, doing mostly care

8    of the seriously mentally ill on inpatient units in emergency rooms." (*Id*.) Dr. Morenz

9    "gradually became involved with forensic psychiatry," which became his subspecialty that

10   he has practiced throughout his career.  (*Id.*)

11       Dr. Morenz has conducted over 1,000 competency examinations over his forty-year

12   career.  (*Id*. at 64.)  He has done competency evaluations both in federal and state court

13   and has testified both for the defense and the prosecution about 100 times.  (*Id.*)

14       Before meeting with a patient, Dr. Morenz reviews any "psychiatric psychological

15   records as well as the relevant police reports[.]". (*Id.* at 66.)  Dr. Morenz begins a

16   competency evaluation by first making sure the patient understands the purpose of the

17   evaluation.  (*Id*. at 65.)  He then attempts to "get an understanding of how they are

18   functioning at that point in time, if they're in prison or out of custody," whether they are in

19   treatment, whether they are having symptoms, and their "emotional psychiatric adjustment

20   in their current circumstances."  (*Id.*)  He then obtains background information — their

21   developmental history, their educational history, and their interim history if he has seen the

22   patient previously — to learn "where they came from and what kind of problems they've

23   had of a psychiatric and emotional nature in the past."  (*Id*. at 66.)  Dr. Morenz then starts

24   discussing "their understanding of their current legal predicament," how the court works,

25   and "the principal parties involved" (*e.g*., the judge, the jury, the prosecutor and defense

26   attorney).  (*Id*.)  Additionally, Dr. Morenz discusses with the patient how these legal

27   concepts apply in their case – *e.g*., what "their defense might be, their understanding of the

28   kind of consequences, [and] the charges against them." (*Id.*)  Dr. Morenz will sometimes

administer a brief cognitive screening test as part of his competency evaluation.  (*Id*. at 67.)

However, "the various tests that are available do not answer [the] question" of whether someone is competent to stand trial because that decision ultimately "resides with the judge."  (*Id*.)

Dr. Morenz conducted a competency evaluation of the defendant on October 3, 2023.  (*Id*. at 68.)  Prior to meeting with the defendant, Dr. Morenz reviewed disciplinary records from Indian Oasis Alternative High School, Indian Health Service records, CCA health records, and some Tohono O'odham police reports.  (*Id*.)  Dr. Morenz thinks that the defendant understood the purpose of the evaluation.  (*Id*.)  The defendant "had a limited sort of understanding but it seemed to improve with explanation."  (*Id*.)

The defendant was disorganized in his responses during the discussion of legal concepts.  (*Id*. at 69.)  At the time of this evaluation, Dr. Morenz was not sure that the defendant has "a very good understanding of court or the potential consequences he could face.  He did know that the charge against him was second degree murder.  He could identify his attorney at least by his first name, Jordan, and that he had met with his attorney."  (*Id*.)  The defendant's "understanding of his attorney's role was sort of correct;" he said his attorney's job "was to find evidence and see if I tell the truth" and "help him."  (*Id*. at 69-70.)  He also seemed comfortable with his attorney.  (*Id*. at 70.)

However, "there were clear inaccuracies."  (*Id*.)  For instance, "he thought that in some way the prosecutor would also . . . potentially help him."  (*Id*.)  He was "really confused about some of the principal people involved . . . in court and what their roles were."  (*Id*.) He knew that "a jury would determine whether he was guilty or not.  But he didn't know where the jurors came from or how many people there were on a jury."  (*Id*.) "[H]e eventually was able to sort of say that the judge would kind of sentence him."  (*Id*.) But "he didn't exactly say sentence.  He said, give me more time in jail."  (*Id*.)  The defendant "had no problem with the judge" and was not "paranoid that the judge was conspiring with the prosecutor[.]"  (*Id*.)  The defendant did not know his legal rights.  (*Id*.) He did not "really understand the idea of a defense, other than he just wouldn't say

anything.  And he said he just was afraid that . . . whatever he would say would just make his situation worse." (*Id.* at 70-71.)  He said that "they already said I'm guilty." (*Id.*)  He seemed to have difficulty understanding whether the court views him as "guilty or not guilty[.]"  (*Id.*)  He thought "that when they came to get him to bring him [for the evaluation], that he was going to be released." (*Id.*)  He was "really confused about . . . how the court worked and how the proceedings against him would work." (*Id.*)  He said he did not know what a plea agreement is and did not "think that the proceedings against him would be fair." (*Id.*)  He had no idea of how the charges against him will be resolved. (*Id.*)

Based on Dr. Morenz's interview of the defendant, "it was pretty clear" that the defendant "was not competent to stand trial.  Not only did he not understand the various roles of people involved in the court, he really didn't understand how the specific legal proceedings against him would unfold or even how they were occurring at this point in time." (*Id.* at 71-72.)

When discussing legal concepts, Dr. Morenz used very simple language and repeated questions if it was clear the defendant did not understand a question.  (*Id.* at 73.)  In addition to assessing whether a defendant understands legal concepts, Dr. Morenz assesses whether a defendant understands the concepts "as applied to them specifically." (*Id.*)  Dr. Morenz usually does not use hypotheticals because what's important is how legal concepts apply to a defendant's case and not "what might happen in some . . . other kind of case." (*Id.*)

The defendant had never received any psychiatric treatment, medications, or psychiatric hospitalizations.  (*Id.* at 74.)  He denied having any auditory hallucinations. (*Id.*)  He was not paranoid, grandiose, and did not appear delusional.  (*Id.*)  He has never attempted suicide, but he did admit to some depression.  (*Id.*)  He minimized problems with anxiety.  (*Id.*)  He did not seem to have "any kind of psychotic symptoms or serious sort of psychiatric problems[.]" (*Id.*)

The defendant "had a very chaotic upbringing." (*Id.*)  He was "just with his parents

briefly;" his father ended up in prison and his mother could not take care of him.    He "moved from one family member's house to another." (*Id.*)    As a result, he did not have a "very supportive or stable sort of upbringing." (*Id.* at 75.)  The defendant never did well in school; he was never in special education but did get some tutoring. (*Id.* at 74-75.)  He had cognitive limitations and struggled learning in school. (*Id*. at 75.)  His grades "weren't good" and "he never completed school." (*Id*.)  He also had "a lot of disciplinary problems in school" and "difficulties with the tribal police." (*Id.*)

A Mental Status Examination is done by all psychiatrists. (*Id*.)  The examination consists of the psychiatrist making observations about the patient, including their appearance and how they relate to the psychiatrist. (*Id*.)  With respect to the examination of the defendant, Dr. Morenz noted that he was clean and "in the usual jail clothing." (*Id*.) He was cooperative and "his mood was euthymic," which "means just kind of normal." (*Id*.)  "[H]e had a fairly bland affect;" "he didn't smile much," and "was kind of somewhat wooden." (*Id*. at 76.)  He was not tearful or emotional. (*Id*.)  "[H]e was sometimes difficult to understand because his articulation was not very good." (*Id*.)  In fact, "sometimes even with repetition," Dr. Morenz was not sure that the defendant "was completely understanding him." (*Id*.)  His responses to questions were "brief" and "limited." (*Id*.)  As a result, "it was not easy to obtain meaningful relevant information from him." (*Id*.)

Dr. Morenz administered a cognitive screening test on the defendant. (*Id*.)  "[H]is score was very poor, 16 out of 30." (*Id*.)  The poor performance "could be accounted for because of anxiety associated with the evaluation" and his "achievement level educationally and cognitive deficits." (*Id*.)

Dr. Morenz also conducted a SLUMS examination on the defendant. (*Id*.)  In Dr. Morenz's report, he noted that the defendant's score was "shockingly low." (*Id*. at 77.)  A person with "mild to moderate dementia might score" 21 or 22; the defendant's score was 16. (*Id*.)  Dr. Morenz believes that the defendant was cooperating, but the situation is "kind of anxiety provoking" because the defendant did not know him and it was "a strange environment." (*Id*.)

Dr. Morenz has no reason to believe that the defendant was malingering because he was cooperative and there was no indication that he was exaggerating symptoms. (*Id.* at 78.) In fact, he "pretty much minimized any psychiatric symptoms," whereas "people who are exaggerating mental illness or wanting to amplify symptoms will usually endorse a number of symptoms." (*Id.*)

Dr. Morenz diagnosed the defendant with a mild neurocognitive disorder; however, he "added a provisional qualifier because to conclusively give that diagnosis" neuropsychological testing should be done. (*Id.* at 78-79.) The results of the cognitive screening test that Dr. Morenz administered, the defendant's poor verbal skills and articulation problems that he demonstrated during the evaluation, and his substance abuse problems, all suggest that the defendant "might have some acquired cognitive problems." (*Id.* at 79.) The difference between "neurocognitive disorders and an intellectual disability is primarily that [an] individual" with an intellectual disability has cognitive limitations from birth. (*Id.*) Dr. Morenz "didn't know enough about [the defendant's] early years to know whether a mild intellectual disability might be more apt than a mild neurocognitive disorder." (*Id.*)

Based on his evaluation, Dr. Morenz concluded that the defendant "was incompetent to stand trial, that he didn't understand the proceedings against him, and also would have difficulty assisting his attorney in his own defense." (*Id.* at 80.) That conclusion was based on the defendant mixing up "what the roles of people were in court" and his confusion about how the court worked. (*Id.*) As a result, "he couldn't really adequately work with his attorney because he didn't really understand what was going on in court." (*Id.*) Dr. Morenz's recommendation was that the defendant "get neuropsychological testing done" so there "would be a better delineation of the extent of whatever cognitive deficits he might have. And then assuming that his deficits weren't so severe, that he would receive education that could help . . . restore him to competency." (*Id.*) At the time of this examination, Dr. Morenz was uncertain whether the defendant could be restored to competency. (*Id.* at 81.) He thought that there was a reasonable chance of restoration if

- 24 -

1    the defendant's cognitive deficits were not too severe.  (*Id.*)

2        Dr. Morenz's initial evaluation of the defendant took about an hour and fifteen

3    minutes.  (*Id*.)  The defendant's evaluation "was probably shorter than many because he

4    didn't talk a lot."  (*Id*.)  "[H]is responses to questions . . . were very brief" and "there was

5    a lot he just didn't know."  (*Id.*)

6        In April or May of 2025, defense counsel asked Dr. Morenz to review Dr. Osborn's

7    report.  (*Id*. at 82.)   The defendant spent several months at MCC Chicago and Dr. Osborn

8    prepared a report "that indicated that in [her] opinion [the defendant] had been restored to

9    competency[.]"   (*Id*.)   Defense counsel "had some ongoing concerns" based on his

10   interactions with the defendant "about whether he . . . was truly competent at this point[.]"

11   (*Id.*)

12       Dr. Osborn diagnosed the defendant with a personality disorder with antisocial

13   features.  (*Id.*)  Dr. Morenz thinks that "it's really hard" and premature to diagnose the

14   defendant with a personality disorder because "he's still young, and his background was

15   so troubled." (*Id*.)  As a result, "there's sort of multiple explanations for a number of his

16   behavioral problem[s]."  (*Id*. at 82-83.)   There are many factors in the defendant's

17   background – *e.g*., growing up impoverished, having very few stable nurturing figures,

18   little structure, and abusing drugs -- that "could contribute to what looks like a personality

19   disorder."  (*Id*. at 83.)  Additionally, a person with a "pretty typical antisocial personality

20   disorder" has "some measure of  . . . a predatory nature" where they want to "satisfy needs

21   that they have" and "have no compunction against exploiting others to basically satisfy

22   those needs."  (*Id*.)   That is "not really the character that" Dr. Morenz saw with the

23   defendant.  (*Id.*)

24       Dr. Osborn's report notes that the defendant has an IQ score of 63; Dr. Weller's

25   report notes a score of 71.  (*Id*. at 85.)  Less of an emphasis is now placed on an IQ score

26   because of the factors that impact the score, such as cultural background, home

27   background, and language abilities.  (*Id*.)  The IQ score range combined with a person's

28   adaptive abilities are more important in diagnosing an intellectual disability.  (*Id*. at 86.)

"But even if [a person] fell outside of that range and [their] adaptive abilities were poor, you can still potentially make the diagnosis of a mild intellectual disability." (*Id.*)  The defendant is "certainly in the mild intellectual disability range with the IQ scores.  And his adaptive abilities have been miserable." (*Id.*)

A person with a mild intellectual disability can "hold a job," but "they often have difficulty on the job" and "often need support." (*Id.* at 87.)  Absent that support, "they're not going to do well in the workplace." (*Id.*)  The ability of a person with a mild intellectual disability to follow directions or simple instructions is an important point because "[o]ften these individuals are dependent on others for their own welfare" so they are "eager to please." (*Id.* at 87-88.)  "So if the instructions are simple enough and straightforward enough and the person that's trying to teach them is patient, . . . they're very eager to try to figure it out and what they're asked to do." (*Id.* at 88.)  However, "if the instructions get more complicated or they're provided to them too fast or they're too abstract," then "they can't really get it" and cannot "actually function in that capacity." (*Id.*)

Dr. Morenz conducted his second evaluation of the defendant in June 2025. (*Id.* at 88.)  Defense counsel asked Dr. Morenz to conduct a second evaluation because counsel still felt that the defendant "just really wasn't understanding what has happening in his case[.]" (*Id.*)  Dr. Morenz's approach to the second evaluation was different than the first evaluation because he "was only interested in the interim history" between the first and second evaluations. (*Id.* at 89.)  Specifically, given the defendant's "education about court and his treatment" at MCC Chicago, Dr. Morenz was focused on whether he had improved and was competent to stand trial. (*Id.*)

The defendant said that he was not experiencing any psychotic symptoms (*e.g.* hallucinations or delusions) anymore. (*Id.* at 89-90.)  Dr. Morenz did not see any evidence of those symptoms.  The defendant said that "he had classes about court," but "he tends to forget." (*Id.* at 90.)  But he seemed to "take some pride in his improved understanding of the court process." (*Id.*)  For instance, he seemed to "take some pride that he kind of has a better understanding of where people sit in court, where the jury would be and where the

judge would be." (*Id.*)  He added that "he knew about the bailiff, and he was pleased with that." (*Id.*)  When asked about the court reporter, the defendant said "[h]e didn't know what the court reporter was all about.  But otherwise, he . . . had a reasonable understanding of how the courtroom was laid out and who sat where." (*Id.* at 91.)

Dr. Morenz's report notes that the defendant described a plea agreement as follows: "Instead of going with big stuff, go with the second plan that they are sure that we can come to an agreement on." (*Id.*)  Dr. Morenz's opinion is that the defendant's explanation "reflects a very kind of limited, very circumscribed kind of understanding that . . . something happens with a plea agreement and . . . that that might be something he might be involved in.  But exactly how that would unfold and what he would have to do was not really still clear to him." (*Id.*)  However, he did know that a plea agreement could result in him getting a "12-to-15 year sentence instead of a life sentence[.]" (*Id.*)  He also "knew that by taking a plea agreement, he would have to plead guilty to second degree murder." (*Id.*)

The defendant still seemed "a little confused about how the whole process is going to unfold." (*Id.* at 92.)  Specifically, he is still "confused about what stage of the trial he is in or stage of the legal process he's in.  Almost as if he feels that it's already been determined that he's guilty" and he only has to go through the sentencing. (*Id.*)  Dr. Morenz expected the defendant "to perform better during this evaluation" after spending months at MCC Chicago. (*Id.*)  In fact, after reading Dr. Osborn's report, Dr. Morenz told defense counsel that he was "not sure if it's worth him seeing [the defendant] again" because "it seemed like he was a lot better." (*Id.*)

The defendant was cooperative during the second evaluation and "was a little more organized" and forthcoming with information than during the first evaluation.  (*Id.* at 93.)  Dr. Morenz attributes those things to the defendant being sober for quite a while, as well as being in a structured and supportive environment where he had a regular schedule and reasonable nutrition.  (*Id.*)

After the first evaluation, Dr. Morenz diagnosed the defendant with a mild

intellectual disability. (*Id.*) Based on Dr. Osborn's report, it was "increasingly clear that [the defendant's] problems have been with him for a long time" and may have grown worse from substance abuse and other factors. (*Id.* at 94.) Dr. Morenz now believes that "the most apt diagnosis" for the defendant is a "mild neurocognitive disorder." (*Id.*)

A person with an intellectual disability like the defendant has the ability to memorize "really basic concrete information that's not too complicated," especially with repetition. (*Id.* at 95.) However, a defendant "also has to use [the information]" and "if it's not something that they're using or practicing routinely, it will probably fade somewhat." (*Id.* at 95-96.) The defendant was able to recall and parrot back basic information about the court process. (*Id.* at 96.) However, a defendant's ability to convey information about the court process "is not the same as actually having a rational understanding of that information." (*Id.* at 96-97.) "[W]ith regard to things like plea agreements" and "your rights to a trial, . . . it's going to be very hard for someone with a mild intellectual disability to understand" these concepts. (*Id.* at 96.) Additionally, even if the person understands these legal concepts, "a lot of repetition and practice" will be needed for the attorney "to be confident that [a defendant] is making an informed decision" in waiving their right to a trial and entering into a plea agreement. (*Id.*)

Dr. Morenz's opinion is that the defendant is still not competent to stand trial. Dr. Morenz thinks that the defendant's "understanding of courtroom proceedings [has] improved" because he did "have a better understanding of the adversarial nature of the court. But he continued to be a little confused about . . . how the process would work with respect to him." (*Id.* at 94.) As a result, Dr. Morenz still has questions about the defendant's "fundamental understanding of court proceedings, especially when it gets to more abstract concepts, like plea agreements or pleading guilty," and that you are sentenced "when it is determined that you're guilty." (*Id.* at 94-95.) The defendant's "incomplete" and/or "inaccurate" understanding of the court process compromises his ability to assist counsel. (*Id.* at 95.) Additionally, the defendant "continues to kind of look to others to help him make decisions." (*Id.* at 94.) As a result, Dr. Morenz believes that "it's going to

be difficult, especially in this complex murder case, for [the defendant] to make truly autonomous decisions . . . ." (*Id.*)  For example, Dr. Morenz does not think the defendant can "rationally understand the importance of mitigating factors that would need to be used for plea negotiations on a homicide case[.]"  (*Id.* at 98.)  He also thinks "[i]t would be very difficult" for the defendant to understand whether "a lesser included offense should be pursued at trial[.]"  (*Id.* at 98-99.)  It would also be very difficult for the defendant to make a rational decision about whether he should testify.  (*Id.* at 98.)  As a result, Dr, Morenz believes that the defendant would rely on his attorney to make that decision.  (*Id.*)

Because competency is a fluid concept, it is possible that a person "could appear to have been restored" to competency "only to later be found incompetent again[.]" (*Id.* at 95.)  The defendant's overall understanding of information about the court process seems to have waned since he left MCC Chicago.  (*Id.* at 96.)  "[G]iven all the work that has been done" with the defendant at MCC Chicago, Dr. Morenz is not confident that the defendant can be restored to competency.  (*Id.* at 97.)

### 2. Cross-Examination

At the time of the second evaluation, Dr. Morenz did not know if the defendant was taking prescribed medication.  (*Id.* at 101.)  Dr. Morenz believes he asked the defendant if he was taking medication, but "[i]t wasn't clear" because "he gave a vague response." (*Id.*) Dr. Morenz did not follow up with CCA to ask if the defendant was taking his medication. (*Id.* at 102.)  Whether the defendant was still taking medication was "possibly" an important piece of information.  (*Id.*)

Dr. Morenz did not diagnose the defendant with any psychotic condition because it was not clear whether the defendant had psychotic symptoms.  (*Id.* at 102-103.)  During the second evaluation, the defendant said that he was not experiencing any hallucinations or delusions.  (*Id.* at 103, 105.)

Dr. Morenz's first evaluation lasted an hour and fifteen minutes; the second evaluation was shorter because he was not "covering [the defendant's] whole history."  (*Id.* at 104.)  It is possible that a medical professional would "get a better idea of what somebody

is all about" over the course of four months.  (*Id.* at 105.)

The defendant told Dr. Morenz that "he went to classes to learn about court[.]"  But he also said "it was something that it was easy for him to forget about." (*Id.* at 105.)  The defendant told Dr. Morenz that the jury sits "[o]ff to the side," "the judge is in front of everyone," and "the prosecutor sits at another table away from the defense attorney[.]" (*Id.* at 106.)  The defendant said "that the bailiff keeps track of everything that's going on[.]" (*Id.* at 106-107.)  The defendant "was able to describe the time of the alleged offense in some detail[.]" (*Id*. at 107.)  He knows that he is charged with second degree murder and faces a maximum sentence of life in prison. (*Id.*)  The defendant said that "his attorney wants to argue that he is mentally not all there, but he is not sure how that would help[.]" (*Id*. at 108.)  Although the defendant does not have to understand the details of what it means to present an insanity defense, Dr. Morenz believes that "he should be able to articulate that this is a possible option that is available to him." (*Id*.)  Dr. Morenz also believes the defendant needs to understand the concept of competency to stand trial.  (*Id.*) Although the defendant "doesn't need to know the details," he "needs to be able to discriminate how [these kinds of things] might be used to assist him." (*Id.* at 109.)

The defendant told Dr. Morenz that "the prosecutor believes I was capable of doing it" and "believes I should go to prison," which are both "fair statement[s.]" (*Id.* at 109-110.)  When asked "what would happen at trial and with the jury" and "how a trial works," the defendant said "I'm not sure." (*Id.* at 110-111.)  The defendant did say that he "could tell [his] side of the story" and "the jury decides what they think about it," which are also fair statements.  (*Id.* at 111.)  The defendant knew there were 12 jurors and "they decided whether he was guilty or not," but he did not know where they were selected from.  (*Id.* at 111-112.)  He said that guilty means "you're caught" and "you did this[.]"  (*Id.* at 112.) He said the judge would decide guilt if there was not a jury.  (*Id.* at 112-113.)  He said "the judge was in charge of the courtroom and makes sure everyone does their job," which is a correct statement. (*Id.* at 113.)  When asked "what would happen if his attorney made a motion and the government objected," he said "it would be what the judge wants." (*Id.* at

113.)    Dr. Morenz agreed that a defendant does not necessarily have to know "the specifics" about the process of how a judge computes a sentence in order to be competent. (*Id.* at 114.)

The defendant could not enumerate his legal rights. (*Id.* at 115.)  When asked to enumerate his rights, he said: "I don't know." (*Id.* at 116.)  The defendant's inability to enumerate his rights was odd given that "he had just been through a lot of education about the court[.] " (*Id.* at 116-117.)  When Dr. Morenz reminded the defendant of a right, he acknowledged the right. (*Id.* at 117.)  For example, when Dr. Morenz asked if he had a right to remain silent, a right to have an attorney, and a right to a trial, the defendant said he did have each right. (*Id.* at 115.)  But the defendant did not tell Dr. Morenz that he had these rights. (*Id.* at 116.)  Dr. Morenz's opinion that the defendant is not competent is not based solely on the defendant's inability to articulate his legal rights. (*Id.* at 122.)

The defendant "said that he had been offered a plea of 12 to 15 years and five years probation;" Dr. Morenz accepted counsel's representation that this is the plea offer. (*Id.* at 119.)  The defendant said he would have to admit to second degree murder. (*Id.*)  When asked "what he would lose if he accepted a plea agreement," he said: "losing the truth of what happened." (*Id.*)

The defendant understands court decorum – *e.g.*, shower, shave, wear ironed clothes, and "[b]ehave with respect." (*Id.* at 120.)  He was cooperative with Dr. Morenz during the second evaluation. (*Id.*)  "His speech was articulate" and "logical and at a normal volume and rate." (*Id.*)  He got tangential or circumstantial but was easily redirected. (*Id.*)

Dr. Morenz agreed that the defendant's attorney can remind him of his rights and that there is nothing wrong with the defendant looking "to his two attorneys for guidance to assist him in [making] decisions[.]" ( *Id.* at 121-122.)  Dr. Morenz's report notes that the defendant will "have a strong tendency to just do whatever he perceives his attorney wants him to do." (*Id.* at 122.)  Dr. Morenz agreed that the defendant may be "doing himself a disservice" if he does not follow his attorney's advice about whether to go to trial

1  or testify at trial.  (*Id.* at 122-123.)

2              3.    Re-Direct Examination

3        Dr. Morenz's opinion is that the defendant is not competent is based on his

4  intellectual disabilities, and not any psychotic condition.  (*Id.* at 128.)

5        With respect to the defendant's understanding of his "big three rights" (*e.g.*, to have

6  a trial, to testify at trial, and to have an attorney), Dr. Morenz asked open ended questions

7  because he "want[s] to know what [the defendant] understands about [the] particular topic"

8  and what "he can generate spontaneously from his knowledge and memory, especially in

9  the follow-up after he's just been educated about all of these items."  (*Id.* at 129.)   Dr.

10 Morenz expected that the defendant would remember "at least a couple" of his rights

11 without further prompting because he had recently completed the four-month restoration

12 program.  (*Id.* at 130.)

13       Dr. Morenz believes that the defendant should be able to understand, "at least in a

14 general sense," the mitigating factors that could potentially help get him a better sentence.

15 (*Id.* at 130-131.)   Dr. Morenz does not think the defendant can assist counsel with making

16 an informed decision about whether to pursue a lesser included offense at trial.  (*Id.* at 131.)

17 The defendant also does not "fully connect . . . that he can potentially use his mental health

18 as an argument for his not being competent to stand trial or an insanity defense or as a

19 mitigator."  (*Id.* at 132.)

20       The defendant understands "some of the basic things" about the court process, but

21 "he still gets some of the basic things" incorrect.  (*Id.* at 136.)   For instance, the defendant

22 can recall some concrete things, such as that there are twelve jurors.  (*Id.* at 135.)   However,

23 he did not know that the jury verdict has to be unanimous; he said the verdict would be

24 based the "one that has more," which implies a majority.  (*Id.*)   Dr. Morenz is sure that the

25 defendant's attorney has explained that a jury verdict must be unanimous, but "[h]e still

26 doesn't get that."  (*Id.* at 136.)

27       The defendant's ability to recall the 12 to 15 year plea offer is also "a very concrete

28 kind of thing . . . that he would have a better ability to remember."  (*Id.* at 132-133.)   But

his ability to recall the sentencing range does not demonstrate that he understands the concept of a plea agreement. (*Id*. at 133.) The defendant is "most interested" in the amount of time he would spend in prison. (*Id*.) "But how you get there . . . is still really pretty fuzzy for him." (*Id*.)

Although the defendant was able to articulate that he would have to plead guilty to second degree murder, Dr. Morenz is not sure that the defendant fully comprehends "the whole process of waiving his trial rights[.]" (*Id*.) It would be very difficult for the defendant to decide whether pleading guilty is in his best interest. (*Id*.) The defendant is "going to have a tendency to listen" to what his attorneys "have to say and do his best to understand what [they are] proposing." (*Id*. at 134.) But, "in the end, he's going to just agree with [his attorneys] because he doesn't really fully understand and he's dependent on [his attorneys] to make those decisions." (*Id*. at 135.) Dr. Morenz thinks it is highly unlikely and he "would be extremely surprised if [the defendant] sort of opposed anything [his attorneys] suggested" and say, for instance, "I want to go to trial. I'm innocent." (*Id.*) The bottom line is that as things get more complex, the defendant "has more difficulty" because "he really has limitations on how much he can learn, how much he can retain, and how much he can apply what he does know in some kind of rational manner to assist himself" and his attorney. (*Id*. at 136.)

### 4. The Court's Examination

Dr. Morenz reiterated that the defendant "does understand that if he pleads guilty" he is "saying he did it." (*Id*. at 138.) However, "he's seeing his attorneys as recommending that this is the path he should take as opposed to autonomously kind of making his own decision about, 'Yeah, I don't think I'm going to do well in trial because there's all this evidence against me . . . and I'm going to lose. And I'm going to spend truly the rest of my life in prison.'" (*Id*.) Dr. Morenz has had "plenty of defendants . . . who . . . readily articulate that kind of thing or admit that" they cannot go to trial and are hoping their attorney can get them "a better plea agreement." (*Id.*) The defendant "doesn't get that" and "really doesn't understand that." (*Id*. at 138-139.) Dr. Morenz believes that the

defendant is unable articulate that he is hoping for a better plea agreement and that if he gets one that he is "going to take that." (*Id.* at 139.)  Dr. Morenz is "not even sure that [the defendant] fully understands that he is still seen by the court as fully not guilty until he takes further steps in court."  (*Id.*)  Again, the defendant is dependent on his attorneys "to guide him and remind him" of legal concepts.  (*Id.*)

### C.   Oral Argument

#### 1.   Government counsel

Government counsel "think[s] that Dr. Morenz's standard for competency is entirely too high"and is "way above the legal standard." (*Id.* at 141, 143.)  Specifically, "Dr. Morenz has this idea that if you can't pass an open-ended pop quiz question of all these different things that go into competency, that you're not competent because you have this cognitive issue." (*Id.* at 141.)  Counsel also pointed out that Dr. Morenz only spent an hour-and-fifteen minutes with the defendant and issued a three page report.  (*Id.* at 144.)

Government counsel acknowledged that the defendant has cognitive issues.  (*Id.* at 141.)  However, "the defendant is not an island just being tossed out there to defend himself."  (*Id.*)  "[H]e's got two really good attorneys" who have "the resources of the Federal Public Defender's office at their disposal[.]"  (*Id.*)  Dr. Morenz seems to think that "if you can't just defend yourself and know what all your rights are, then you're not competent to go forward."  (*Id.*)  That is not the legal standard. (*Id.*)

Counsel believes that Dr. Morenz seems to "agree that we're not really talking about whether [the defendant] understands things or not.  We're here about whether he can assist [his attorneys]. And assistance is a two-way street." (*Id.* at 142.)  The defendant "assists his attorneys in that he gives them answers to the big three questions[.]"  (*Id.*)  The defendant seems "to have a really good understanding" of whether to plead guilty or not. (*Id.*)  Counsel also pointed out the Dr. Morenz "couldn't say yes or know" in response to the Court's question of whether the defendant can assist his attorneys in making a decision about whether to plead guilty or testify at trial.  (*Id.*)

1

2.    Defense counsel

2    Defense counsel pointed out that there are five expert reports addressing the

3    defendant's competency to stand trial; four of those five reports conclude that he is not

4    competent.  (*Id.* at 145.)  "[W]hat's important about each one of those reports is that they

5    were spaced out over time" and four of the five reports were "prepared by different

6    evaluators" – Dr. Brookham in 2023, Dr. Morenz eight months later in 2023, Dr. Weller in

7    the summer of 2024, Dr. Osborn in December 2024, and Dr. Morenz in 2025.  (*Id.* at 146.)

8    Dr. Morenz's opinion that the defendant is not competent is significant because he had the

9    "unique opportunity" to meet with the defendant "before and after restoration."  (*Id.*)

10    Counsel highlighted some contradictions in Dr. Osborn's report.  (Id. at 146-147.)

11    For example, Dr. Osborn's report says that "IQ scores were slightly skewed because he

12    presented with low motivation and effort."  (*Id.* at 147.)  However, that is not true because

13    the IQ test administrator said that the defendant "put effort into the IQ test, except that he

14    had problems with one specific subtest, the . . . reasoning subtest."  (*Id.*)  Additionally, Dr.

15    Osborn did not consider that the defendant "scored below average on the same part of the

16    test" administered by Dr. Weller "months before."  (*Id.*)  Thus, "[t]here is a pattern here."

17    (*Id.*)

18    There is also a pattern in Dr. Osborn's report with the types questions asked by the

19    defendant.  (*Id.*)  "He asked for basic definitions at many of these interviews . . . and sit

20    downs with the evaluators."  (*Id.)*

21    Counsel argued that the most interesting part of Dr. Osborn's report was the

22    November 27, 2024 entry which says that the defendant's "perception about how his case

23    is likely to be resolved appear[s] to suggest poor rational understanding." (*Id.* at 147-148.)

24    But then 26 days later, after conducting the final competency examination on December

25    23, 2024, the defendant "overcomes this and apparently has a logical, realistic, and

26    [reasonable] understanding of the nature and consequences of the case against him.  So for

27    three of the four months that he was [at MCC Chicago], he apparently couldn't meet the

28    *Dusky* standard, and that's with him being on medication." (*Id.* at 148.)

"[W]ith respect to case comprehension, retention, or just generally being rehabilitated to make rational decisions in his case," defense counsel is "just not seeing it." (*Id.*)  And it is "much more than [counsel] just kind of shepherding [the defendant] through the process.  He has to consent to certain things.  And he also has to knowingly and voluntarily waive certain things and rights."  (*Id.*)

The defendant's attorneys have been meeting with him separately so they can record their observations independently and not be tainted by each other's observations or feelings. (*Id.* at 149.)  Mr. Malka provided the following examples of how the defendant's lack of "understanding [of] his rights and him not knowingly waiving those rights has prejudiced him at least recently." (*Id.* at 148-149.)

The defendant has never called the FPD office to talk to Mr. Malka, Ms. Yializis, or former counsel Sonia Fleury.  (*Id.* at 149.)  The defendant continues to think that Ms. Fleury is Mr. Malka's wife despite being told "multiple times that she's not." (*Id.*)  The defendant "still believes that Ms. Fleury is still on this case" and "just hasn't visited him recently." (*Id.*)

On July 14, 2025, Mr. Malka met with the defendant in the courthouse cell block before a court hearing. (*Id.* at 154.)  Government counsel advised defense counsel that law enforcement had met with the defendant "at CCA to ask about a separate incident, not about this case." (*Id.*)  Apparently law enforcement read the defendant his *Miranda* rights and then interviewed him. (*Id.*)  After the court hearing, counsel met with the defendant to ask him about his *Miranda* rights since he was recently read those rights and apparently waived them. (*Id.*)   Based on that conversation, it is clear to counsel that the defendant did not understand his *Miranda* rights. (*Id.* at 156.)  When asked whether he had to answer the officer's questions, the defendant said:  "It felt like it, yeah." (*Id.* at 154.)  When asked what would happen if he did not answer questions, he said: "I would be in a lot more trouble." (*Id.*)  When asked about what the right to remain silent means to him, the defendant said: "Like there's nothing I can do.  I got caught already." (*Id.* at 155.)  When asked what the right to have an attorney means to him, the defendant said: "That whatever

it is, I could, like, fight for it.  Like, tell them my side of the story." (*Id.*)  The defendant said that an attorney is the opposite of a lawyer and that defense counsel is an attorney. (*Id.*)  When asked about what it means that anything he says can be used against him in court, the defendant said: "Like, anything I say that – like, depending on what I say could be – like, it could be, like useful either way, like, on both sides, like, depending on what I say.  Say like – I don't know how to say it.  Say like I said something, whatever I said, it's helpful for the judge or whatever.  But depending on what I said, it would help them on my side.  Like, it could go either way." (*Id.*)  When asked if a person's statement that the drugs belonged to them could be used in court in drug prosecution, he said:  "Well, you're telling truth.  So I don't think that." (*Id.* at 155-156.)

On July 25, 2025, Mr. Malka visited the defendant at CCA and asked "if he thought about the ways to resolve this case, plead or fight." (*Id.* at 149-150.)  "[H]e didn't remember that those were the two options." (*Id.* at 150.)    After being reminded of the two options, "[h]e agreed that those were the options." (*Id.*)  When asked about "the benefits to fighting this case, he said that he really [didn't] know." (*Id.*)  When asked about "the benefits to pleading," he said:  "I would get more prison time." (*Id.*)  When asked why he would get more prison time for pleading guilty, his "response was basically that the longer the case takes to resolve, the more time he will have to serve in prison[.]" (*Id.*)  That response is "like what Dr. Osborn reported, a lack of understanding . . . of the nature and consequences of the case against him." (*Id.*)    Additionally, when asked about the function of the jury, the defendant said: "they come together if there's a hung jury." (*Id.* at 153.)

On August 13, 2025, counsel again met with the defendant.  (*Id.* at 153.)  The defendant said he did not know where the jury comes from.  When asked who the jurors are, he said: "I think they work for the government." (*Id.*)

Defense counsel pointed out the defendant's case is "a bit more difficult" than most cases because there is a potential self-defense claim and a potential request for a lesser included offense jury instruction.  (*Id.* at 150-151.)  The defendant must consent to presenting that defense or asking for that jury instruction.  (*Id.* at 151.)  However, when

counsel explains the various options (*e.g.*, presenting a self- defense claim, asking for a lesser included offense jury instruction, presenting an actual innocence defense, or pleading guilty), "at each and every turn of these options, he will just tell [counsel], 'let's do that, right?'" (*Id.*)  Counsel explained to the defendant that he would probably have to testify "in order to present those types of defenses." (*Id*. at 152.)  When asked if he was "able to testify," the defendant said: "I don't know." (*Id.*)  When asked if he knew who would be in the courtroom when he testified, the defendant said: "I don't." (*Id*.)

Counsel emphasized that "all of these questions continue to come round and round. And we have to start with – back at Step 1 again.  Who is the jury? What are the functions of the jury?  Why would you have to address the jury? Why is it important for you to have to testify in a potential self-defense claim?"  (*Id.*)

Defense counsel noted that "there were no eyewitnesses to the alleged offense." (*Id.*)  There was a woman in a back room that apparently heard a scream which "could support potentially a quarrel." (*Id.*)  As a result, "there is more to this case than just fighting it or pleading." (*Id.*)  Counsel's position is that he cannot present a specific defense without the defendant's consent.  (*Id*. at 153.)  Counsel believes that it would be "unethical" and "fail the *Strickland* standard" if he presented a defense that the defendant did not agree with.  (Id.)  Because the defendant "can't tell [counsel] yes to certain aspects of his case," counsel feels "stuck" and they "return to Step 1." (*Id.*)

Mr. Malka advised that he is not sure if he can "stand up before this court . . . during a change of plea hearing and say [the defendant] . . . is knowingly and voluntarily waiving his right to trial and pleading guilty." (*Id*. at 156.)  Counsel understands that his role is to help the defendant through the legal process.  (*Id*. at 157.)  However, the discussions with the defendant about decisions that need to be made "leads up back to Step 1.  And if we don't have a valid understanding of Step 1, the three basic rights, . . I don't know where we are.  And it's hard for me to move anything forward." (*Id.*)

Co-counsel, Ms. Yializis, shared some of her observations of the defendant.  (*Id*. at 157.)  On August 28, 2025, the defendant finally remembered her name; but he did not

know her role even though she has been on his case for over a year and has been in court with him many times.  (*Id.* at 158-159.)   The defendant said he has two attorneys:  Jordan and Jordan's wife.  (*Id*. at 158.)   The defendant was referring to prior co-counsel, Sonia Fleury, who has a been off the case for almost two years.  (*Id.*)

The defendant "does not often remember concepts.  Every meeting, I feel like we are starting at Square 1."  (*Id*. at 159.)  For example, on May 14, 2025, shortly after the defendant returned from MCC Chicago, counsel asked the defendant "what his two options were."  (*Id*.)  He said "I only have one option."  (*Id*.)  When asked what is was, he said "trial."  (*Id*.)  When asked what do people do who do not go to trial, the defendant said: "I don't know.  I think everybody probably goes to trial. Who knows?"  (*Id.*)  After counsel educated the defendant about a plea agreement and asked what the defendant thought his best option was, he said: "well, I would say plea agreement."  (*Id.*) When asked why that was his best option, he said "because that's what we're talking about right now."  (*Id*. at 160.)   When counsel told the defendant that they are "trying to look at the big picture," he said: "Well, I don't know."  (*Id.*)

On August 13, 2025, counsel asked the defendant "again what his two options were."  (*Id*.)  He said: "Take it to trial or fight the case.  Take it to trial is taking the agreement."  (*Id*.)  He then said that he has "no idea what it means to go to trial."  (*Id*.)  When asked what he meant by "fighting your case," he said "stand up for it;" he then said "but you could go to trial just to see what's up and what they have.  And then he said he really didn't think about any decision.  He doesn't know if he would win or not.  He doesn't know.  He's not even thinking about the case."  (*Id*. at 160.)  The defendant also said that "if I had to decide right now, I'd have to go to trial because that's what you should do. . . . That's what people do."  (*Id.*)  He did not understand that he has the option of taking a plea agreement.  (*Id.* at 161.)

On August 28, 2025, counsel reviewed the indictment with the defendant.  He said he did not know what is was and asked: "Is that stuff I did in my past?"  (*Id.* at 161.)  Counsel again discussed a plea agreement and a trial in more simplistic terms.  (*Id.* at 161-

162.)  The defendant "still couldn't quite understand."  (*Id*. at 162.)  He said that "a trial is a better deal because at a trial, I know what I'm facing.  But I know I could lose."  (*Id.* at 162.)

The defendant does not ask questions and frequently says "I don't know" in response to counsel's open-ended questions.  (*Id*.)  He does not ask questions when he says he does not know something.  (*Id*.)  When counsel explains a legal concept to the defendant, he will say: "Oh, yeah.  Yeah, okay.  But then there's no elaboration."  (*Id.*)  The only question counsel recalls the defendant asking is if he could have the disclosure in his case.  (*Id*.)  When counsel asked if he knows "what disclosure is," the defendant said: "no, I don't know what it is."  (*Id.*)

Counsel represented that they have "no reason to believe that [the defendant's] malingering because he does cooperate.  He does sit down and talk to us.  He does seem like he's trying.  He's not blowing us off.  He is attending his meetings.  He doesn't call us.  But when we speak with him, he is cooperating."  (*Id*. at 163.)  The concern "is that despite going to restoration for four months and learning all of these concepts, at the very least, he should be able to articulate, even in simple language, what his rights are. And we can't even get past that point all these months later."  (*Id.*)

Counsel told the defendant about the competency hearing, but he has no idea of why he is in court today. (*Id*. at 161).  Counsel confirmed that the defendant has been taking the same medication (and dosage) prescribed by the psychiatrist at MCC Chicago.  (10/15/25 Tr. at 3.)

**III.    DISCUSSION**

**A.    Legal Standards**

"A defendant is incompetent to stand trial if the court finds 'by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense[.]'" *United States v. Frank*, 956 F.2d 872, 874 (9th Cir. 1991) (quoting 18 U.S.C. § 4241(d)).

In *Dusky v. United States*, the Supreme Court held that:

> [I]t is not enough for the district judge to find that 'the defendant (is) oriented to time and place and (has) some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'

362 U.S. 402, 402–03 (citations omitted).

The Ninth Circuit has made clear that "competency to stand trial requires an understanding of the *factual* basis of the proceedings and does not require mastery of technical legal knowledge." *Hoffman v. Arave*, 455 F.3d 926, 938 (9ᵗʰ Cir. 2006). However, a defendant must have "the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).

The government bears the burden of demonstrating that the defendant is competent to stand trial. *Frank*, 956 F.2d at 875; *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991). A court's determination of competency is a factual, rather than a legal determination. *United States v. Hoskie*, 950 F.2d 1388, 1392 (citing *United States v. Frank*, 933 F.2d 1491, 1493 (9th Cir. 1991); then citing *United States v. Lindley*, 774 F.2d 993, 993 & n.1 (9th Cir. 1985)). In determining competency, a court "may rely on a number of factors, including medical opinion[s] and the court's observation of the defendant's comportment." *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995) (citations omitted); *see also United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014) (finding three (3) broad categories of evidence relevant to competency: "medical history, the defendant's behavior in and out of court, and defense counsel's statements about the defendant's competency."). "In performing its fact-finding and credibility functions [to determine competency], a district court is free to assign greater weight to the findings of experts produced by the Government than to the opposing opinions of the medical witnesses produced by the defendant." *Frank*, 956 F.2d at 875 (citing *Lindley*, 774 F.2d at 993).

Defense counsel's doubts about a defendant's mental capacity "does not inexorably lead to the conclusion that [a defendant] [is] incompetent to stand trial." *Hoffman v. Arave*, 455 F.3d 926, 938 (9th Cir. 2006). However, an attorney's opinion about a defendant's competency is "entitled to considerable weight because 'defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Marks v. Davis,* 106 F.4th 941, 971 (9th Cir. 2024).

### B.    Analysis

The Court acknowledges that both Dr. Osborn and Dr. Morenz are both knowledgeable and experienced mental health professionals. As a result, the Court is faced with the difficult task of deciding which mental health professional to side with. Ultimately, the Court gives more weight to Dr. Morenz's opinion, as well as defense counsels' opinion, for the reasons discussed below.

1. <u>Dr. Morenz has far more experience than Dr. Osborn.</u>

Dr. Morenz has conducted over 1,000 competency evaluations; Dr. Osborn has conducted about 50 competency examinations. Dr. Morenz has testified about the results of his competency evaluations about 100 times; Dr. Osborn has testified about 10 times. Dr. Osborn's experience in conducting competency evaluations clearly pales in comparison to Dr. Morenz's experience.

Perhaps because of the difference in their experience, Dr. Morenz, unlike Dr. Osborn, believes that a defendant's ability to cooperate with his attorney and convey information about the court process does not mean that a defendant has a rational understanding of that information or the ability to assist counsel. As discussed below, Dr. Osborn did not connect the dots on how the defendant's ability to convey information about the court process and get along with counsel demonstrate an ability to assist counsel in his defense. By contrast, Dr. Morenz did a deeper dive into the defendant's rational understanding of his rights, the court process and players, and his ability to assist counsel. As a result, Dr. Morenz's opinion that the defendant still does not fully understand the proceedings against him and cannot assist counsel is entitled to more weight than Dr.

Osborn's conflicting opinion.

2. <u>Dr. Morenz was in a better position to assess the defendant's ability to retain legal concepts that he learned at MCC Chicago.</u>

Dr. Morenz evaluated the defendant before and after he went through the competency restoration program.  As a result, Dr. Morenz was in a unique position to assess what the defendant had learned about legal concepts and the court process, and more importantly, what information he was able to retain.  As discussed below, the defendant's retention of this information was a problem while he was at MCC Chicago, including when Dr. Osborn conducted her final competency interview of the defendant on December 23, 2024.  Thus, it is not surprising that during Dr. Morenz's second evaluation the defendant could not remember and/or articulate important legal concepts that he recently learned at the restoration classes.   As also discussed below, the defendant's attorneys have also experienced significant problems with the defendant's retention of important information.  The defendant's inability to retain information raises a significant concern about his competency.

 Dr. Morenz's second evaluation is also significant because competency is fluid and can change over time, especially when a defendant has memory problems.   As a result, both doctors' opinions about the defendant's competency at the time of their respective evaluations may well be accurate.

3. <u>Unlike Dr. Morenz, Dr. Osborn did not provide adequate support for her opinions that the defendant understands the proceedings and can assist counsel.</u>

Dr. Osborn provided no basis for her opinion that as of December 23, 2024, the defendant had developed a rational understanding of the proceedings against him.  On November 27, 2024, Dr. Osborn met with the defendant to assess his mental status and his progress with competency restoration.  Although the defendant demonstrated an improved understanding of the court process and players, Dr. Osborn concluded that the defendant's "perception about how his case is likely to be resolved appeared to suggest a poor rational understanding." (Def. Ex. 51 at 15.)  Stated another way, the defendant's beliefs about the

1   outcome of his case were not "grounded in reason or logic or reality[.]"  (9/17/25 Tr. at

2   52.)

3       Dr. Osborn no longer had that concern 26 days later when she met with the

4   defendant to conduct her final competency assessment.  Ironically, at that meeting on

5   December 23, 2024, the defendant was unable to describe the difference between a bench

6   trial and a jury trial and he said that the prosecutor determines the sentence if a defendant

7   is found guilty.  He also said that he was unable to identify the courtroom participants who

8   are involved in the plea bargaining process.  As a result, Dr. Osborn had to provide him

9   with "education" about these legal concepts, even though he had attended 28 competency

10  restoration classes in the 12 subject areas over the past four months.

11      Notwithstanding the defendant's inability to retain this important information, Dr.

12  Osborn testified that on December 23, 2024, the defendant had developed a rational

13  understanding about how his case would be resolved.  However, she failed to explain or

14  provide any details about how the defendant's rational understanding improved in the 26

15  days between their meetings.  In fact, Dr. Osborn did not detail her discussion with the

16  defendant on November 27, 2024, that led her to conclude that the defendant had a poor

17  rational understanding of how his case would be resolved, let alone discuss why she felt

18  that he developed that understanding by December 23, 2024.

19      Similarly, Dr. Osborn failed to explain how the defendant successfully navigated

20  the hypothetical case scenario that she provided to him to assess his competency-related

21  abilities.  In fact, she did not even discuss the hypothetical presented to the defendant, let

22  alone his comments.  Relatedly, Dr. Osborn failed to detail the evidence that the defendant

23  purportedly said might be presented at his trial and the witnesses who might testify.  As a

24  result, the Court is hard-pressed to give Dr. Osborn's opinions much weight given these

25  missing explanations and details.

26      Dr. Osborn also does not sufficiently explain why she believes the defendant can

27  assist counsel in his defense.  Dr. Osborn testified that she relies on the following facts to

28  determine whether a defendant can assist counsel:  whether they know their attorney's

name; whether they have an opinion about their attorney; whether they are willing to work with their attorney; and how they would deal with their attorney if they have a complete disagreement with the attorney.   She believes the defendant is able to assist his attorneys in his defense for the following reasons:  he identified one of his attorneys as Jordan and has spoken with him about eight times; he has a positive relationship with his attorney; he would speak with his attorney if he disagreed with him or with something that was said in court; he would discuss a plea bargain with his attorney; he expects his attorney to help him and stand up for him; he could best help his attorney by telling the truth; he identified the charge as second degree murder and was able to describe the allegations in a rational manner; he was able to identify evidence that may be presented and witnesses who may testify; he knows what a plea agreement is; and he said if he was found guilty he could receive a long prison sentence.

The Court agrees with Dr. Morenz that the defendant's ability to get along with his attorney and convey information about the court process is not the same as having a rational understanding of that information so he can assist counsel in his defense.  The defendant clearly has a good relationship with his attorneys.  However, Dr. Morenz would be surprised if the defendant opposed anything that his attorneys suggested.  (*Id.* at 135.)  The defendant is "going to just agree with [his attorneys] because he doesn't fully understand" how the court process works.  (9/17/25 Tr. at 134.)   He is "totally dependent on his attorneys to make decisions about whether he should go to trial and whether to testify at trial."  (*Id.* at 135.)  He cannot autonomously make those decisions.  (*Id.* at 138.)  And as things get more complex, the defendant "has more difficulty" because "he really has limitations on how much he can learn, how much he can retain, how much he can apply what he does know in some kind of rational manner to assist himself" and his attorney.  (*Id.* at 136.)

Dr. Morenz acknowledged that the defendant had a somewhat better understanding of the court process and was proud of what he learned at MCC Chicago.  However, there were still inaccuracies in terms of his understanding of the roles of the courtroom

participants and the court process.  Specifically, Dr. Morenz testified that the defendant understands some of the basic things about the court process and some concrete things, such as that there are twelve jurors and that he was offered a plea agreement with a 12-15 year sentencing range.  However, he still gets some of the basic things incorrect.  For example, he did not know that the jury verdict has to be unanimous; he was unclear about how the guilty plea process would unfold; he seemed confused about the stage of the legal process (*i.e.*, he feels that he has already been found guilty and only has to go through sentencing); and he does not fully understand that he can potentially use his mental health to support an argument that he is not competent to stand trial, to pursue an insanity defense, or as a mitigator for sentencing.

Additionally, the defendant could not enumerate his legal rights, which Dr. Morenz found odd given that the defendant has just been educated about his rights for four months at MCC Chicago.  Dr. Morenz expected that the defendant would remember "at least a couple" of his rights without prompting.  (*Id.* at 130.)  Dr. Morenz asked open ended questions because he "wanted to know what [the defendant] understands about [the] particular topic" and what "he can generate spontaneously from his knowledge and memory, especially in the follow-up after he's just been educated about all of these items." (*Id.* at 129.)  As was the case with Dr. Osborn, the defendant acknowledged a right when Dr. Morenz reminded him of the right.  But the defendant never spontaneously articulated any of his rights from his knowledge and memory.  Moreover, in many instances, the defendant could not adequately explain and/or demonstrate that he fully understood certain rights.

Because of these many shortcomings, Dr. Morenz is not confident the defendant fully comprehends "the whole process of waiving his trial rights" or "fully understands that he is still seen by the court as fully not guilty until he takes further steps in court."  (9/17/25 Tr. at 133, 139.)  Additionally, Dr. Morenz believes that the defendant does not adequately understand the court process and courtroom participants. The Court has these same concerns about the defendant's understanding the proceedings against him which certainly

inhibit his ability to assist counsel.

### 4. The Court assigns significant weight to defense counsels' opinion about the defendant's competency.

The Ninth Circuit has noted that defense counsel's opinion about a defendant's competency is "entitled to considerable weight because 'defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Marks,* 106 F.4th at 971; see also *Garza*, 751 F.3d at 1134 (three broad categories of information relevant to a defendant's competency are medical history, behavior in and out of court, and defense counsel's statements about a defendant's competency). Based on their many meetings with the defendant, Mr. Malka and Ms. Yializis provided detailed examples of their concerns about the defendant's inability to understand and retain information even after the defendant completed the competency restoration program and continuing to take his prescribed antipsychotic medication. They include: the defendant does not understand his *Miranda* rights; he thinks the indictment is "stuff" that he did in his past; he does not remember that his two options are to plead guilty or fight the case; he cannot articulate the benefits of either option; he does not know what it means to go to trial; he does not know that he has the option of taking a plea agreement; he does not understand the function of the jury or where the jurors come from; and he does not know who will be in the courtroom if he testifies. As a result, counsel feel like they are always starting at "step one" with the defendant when trying to address more complex legal concepts, such as a self-defense claim or pursuing a lesser included offense jury instruction.

Defense counsel noted that the defendant is cooperative during their meetings and there is no evidence that he is malingering.[1] However, the defendant never calls their office to speak with either of them, he almost never asks questions, and he said that he is not even

---

[1] Similarly, neither Dr. Osborn nor Dr. Morenz believe that the defendant is malingering. As discussed earlier, Dr. Osborn testified that the defendant was an active participant in restoration classes and Dr. Morenz testified that the defendant appeared to be proud of what he learned in the restoration classes. Dr. Morenz also testified that individuals who malinger tend to exaggerate mental health issues; the defendant minimized his issues.

1   thinking about his case.  Those facts are shocking generally, but especially in this serious

2   case where the defendant is facing a life sentence if convicted of the offense.

3        Mr. Malka and Ms. Yializis have clearly invested significant time and effort in

4   educating the defendant about legal concepts in the most simplistic way.   Mr. Malka and

5   Ms. Yializis are experienced attorneys who are well respected by the Court. Indeed,

6   government counsel noted that the defendant has "got two really good attorneys." (9/17/25

7   Tr. at 141.)   As a result, the Court affords significant weight to their opinion that the

8   defendant is still not competent.

9   **IV.    RECOMMENDATION**

10       Based on the discussion above, the Court concludes that the defendant still does not

11  have a rational understanding of the proceedings against him or the ability to assist counsel

12  in his defense.  Therefore, it is recommended that the district court find that the defendant

13  has not been restored to competency to stand trial.

14       Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal

15  Procedure, any party may serve and file written objections within fourteen (14) days after

16  being served with a copy of this Report and Recommendation.  No reply shall be filed

17  unless leave is granted from the District Court.  If objections are filed, the parties should

18  use the following case number: **CR-23-00125-TUC-SHR.**

19       Failure to file timely objections to any factual or legal determination of the

20  Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right

21  of review.

22

23                    Dated this 13th day of January, 2026.

24

25

26                    _____

27                    Eric J. Markovich

28                    United States Magistrate Judge